UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Bruce Van Ornum and Steven Shore,                    Civil No. 04-2950 (JMR/FLN)

      Plaintiffs,

      v.                                                        **REPORT AND**
                                                              **RECOMMENDATION**

Transamerica Capital, Inc., AEGON N.V.,
Paula Nelson and Larry Norman, as Individuals,

      Defendants.

_____

James Kaster for Plaintiffs.
Ken Dobkin and Daniel Scott, for Defendants.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on September

8, 2006, on Defendants' Motion for leave to file renewed motion for summary judgment on Count

III of Plaintiffs' amended complaint [#343] and Defendants' motion for summary judgment on

Count III of Plaintiffs' amended complaint [#345].  The matter was referred to the undersigned for

Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons

which follow, this Court recommends Defendants' Motions for leave to file renewed motion for

summary judgment on Count III of Plaintiffs' amended complaint [#343] be granted and

Defendants' motion for summary judgment on Count III of Plaintiffs' amended complaint [#345]

be granted in part and denied in part.

## I.   FINDINGS OF FACT

Defendant Transamerica Capital, Inc. (hereinafter "TCI") is a wholesaling broker-dealer.

(Affidavit of Emily Burkhardt ("Burkhardt Aff."), Ex. E ¶ 3.)[1]  TCI is the wholesaling distributor of variable and fixed annuities, mutual funds and life insurance products issued by separate statutory life insurance companies.  (Burkhardt Aff. Ex. E ¶ 3.)  TCI, like other wholesaling broker-dealers, markets financial products to institutional purchasers, such as certified financial planners or major brokerage firms (known as wirehouses), who, in turn, market those products to individual investors.  (Burkhardt Aff. Ex. M ¶ 4.)  TCI wholesales securities and insurance products for many companies and one such company is Transamerica Life Insurance Company ("TLIC").  (Burkhardt Aff. Ex. E ¶ 4.)  TLIC determines the features of the life insurance products that it issues for sale and, once the features are determined, TCI determines the strategy for marketing those products to the wirehouses, financial planners, banks and brokers.  (Burkhardt Aff. Ex. E. ¶ 7-8; 11.)  TCI creates the marketing materials for the products it wholesales.  (Burkhardt Aff. Ex. E. ¶ 9.)  Plaintiffs are former employees of TCI.  Plaintiffs sold variable annuity products for TCI as wholesalers for TCI.  (Affidavit of Adam Gillette (hereinafter "Gillette Aff.") Ex. 7 ¶ 1; Gillette Aff. Ex. 8 ¶ 1.)[2]

Van Ornum began his employment with TCI in July 2001 and Shore began his employment with TCI in January 2002.  (Burkhardt Aff. Ex. AA attachment 129; Burkhardt Aff. Ex. AA attachment 158.)  During Plaintiffs' employment TLIC issued a line of variable annuity contracts.  (Burkhardt Aff. Ex. T at 18.)  A variable annuity is a contract between an insurance company and an individual wherein the insurance company agrees to provide future periodic payments to the

---

[1] This Affidavit and the accompanying exhibits are located at Docket Numbers 310-316 and 319.  All references to "Burkhardt Aff." refer to the affidavit and exhibits located at Docket Numbers 310-316 and 319.

[2] This affidavit and the accompanying exhibits may be found at Docket Numbers 325 through 331.  All references to the "Gillette Aff." refer to the affidavit and accompanying exhibits that may be found at Docket Numbers 325 through 331.

policyholder.  (Def.'s Mem. at 5.)[3]  However, the amount of those future payments may vary depending on the performance of the securities contained in the annuity portfolio, known as "sub-accounts."  (Def.'s Mem. at 5.)[4]  An investor could purchase a variable annuity contract by investing a premium, or a minimum amount of money, upon purchase, and, within certain restrictions, the investor could add additional premium (referred to as add-ons) to the variable annuity contract over time.  (Burkhardt Aff. Ex. R at 89.)

One of the variable annuity products that Plaintiffs wholesaled during their employment with TCI was a Landmark variable annuity product that was issued by TLIC.  (Burkhardt Aff. Ex. T at 18.)  One of the features of the Landmark variable annuity was a rider product, the guaranteed minimum income benefit ("GMIB") rider.  (Burkhardt Aff. Ex. T at 18-19.)  Investors could choose to add the GMIB rider to their underlying variable annuity contract.  (Burkhardt Aff. Ex. T at 18-19.)  Once purchased, a GMIB rider to a variable annuity contract establishes a floor below which the minimum annuitization value will never fall.  (Def.'s Mem. at 6.)[5]  The purchaser of a GMIB rider is protected from poor market performance in the variable annuity's subaccounts.  (Def.'s Mem. at 6.)[6]  Originally the name of the GMIB rider was the "Family Income Protector" ("FIP").  (Gillette Aff. Ex. 7 ¶ 6.)  The GMIB rider was later renamed the "Managed Annuity Program" ("MAP"), and will be hereinafter referred to as the "GMIB rider."  (Gillette Aff. Ex. 7 ¶ 6.)

In 2002 the growth rate account on TLIC's optional GMIB rider guaranteed that "a monthly

---

[3]Docket Number 309.

[4]Docket Number 309.

[5]Docket Number 309.

[6]Docket Number 309.

life income could be made available based on a hypothetical account value that was growing at 6 percent regardless of what the policyholder's actual cash value was." (Burkhardt Aff. Ex. V at 17.) It is undisputed that TLIC honored and continues to honor the six percent growth rate for all investors who purchased the GMIB rider and did not surrender the rider. (Burkhardt Aff. Ex. T at 157-58.)

There was a contractual provision in the GMIB rider that provided for an upgrade feature which allowed a policy owner whose actual cash value in the subaccounts exceeded the hypothetical account value to "surrender their current rider, terminate it, and purchase a new rider from the company with the benefits . . . terms . . . and conditions of the new rider at the time [the policy owner] made that election." (Burkhardt Aff. Ex. V at 19.) This upgrade feature "meant that if the variable annuity's portfolio of securities (i.e., actual performance of the subaccounts), exceeded the applicable growth rate (6% prior to May 2003), the investor could 'upgrade' their Minimum Income Base ("MIB") to the actual policy value." (Def.'s Mem. at 8, n. 8.)[7] In order to upgrade the MIB "an eligible investor would surrender their existing rider and purchase a new rider with the higher policy value, subject to the fees, terms and conditions in place for the then-offered rider. An investor became contractually eligible to 'upgrade' after holding the rider for one year." (Def.'s Mem. at 8, n. 8.)[8] The upgrade feature benefitted

> policy owners by allowing them to elect to lock-in a gain based on the 'cash value' of the underlying investment funds upon every anniversary of the policy date. The locked in amount would then serve as the new principal amount for the 'annuity value' during the next year and the new value would then grow at the guaranteed minimum percentage rate for the next year.

---

[7] Docket Number 309.

[8] Docket Number 309.

4

(Gillette Aff. Ex. 7 ¶ 9.)  In order to exercise the option to upgrade, an investor was required to own the rider for at least one year.  (Gillette Aff. Ex. 7 ¶ 10.)

TCI required wholesalers to utilize only marketing materials provided by TCI in the sale of its products.  (Gillette Aff. Ex. 7 ¶ 11.)  Van Ornum testified that

> [t]he marketing materials provided by [TCI] for the TLIC variable annuity GMIB Rider represented that the base level guaranteed percentage rate for the 'annuity value' of the investment was 6%.  With the 'upgrade' option, on or after the one year anniversary date, the investor could 'upgrade' their GMIB Rider if an investor's 'cash value' of the underlying investment funds had increased more than 6%, the investor could lock-in the new 'cash value' as the principal amount of the 'annuity value' and continue to grow at a guaranteed percentage rate of 6%, even if the underlying 'cash value' subsequently declined.

(Gillette Aff. Ex. 7 ¶ 12.)  Van Ornum testified that the marketing materials for the TLIC GMIB rider "represented the growth of the annuity value based on the 6% figure with subsequent yearly calculations all based on the 6% rate." (Gillette Aff. Ex. 7 ¶ 13.)

Van Ornum testified that TLIC could "could change the terms of the rider on upgrades or even for future sales . . . of the GMIB rider, but [TLIC] would always offer an upgrade at terms no less than a 3 percent compounding rate on the guarantee account."   (Burkhardt Aff. Ex. T at 158.) In January 2003 TLIC decided to "withdraw the availability of [GMIB] riders for new sales." (Burkhardt Aff. Ex. V at 15-16.)  This decision meant that, after January 2003, new purchasers of TLIC's variable annuity contracts would no longer be able to purchase GMIB riders.  In addition, after this decision was made, Larry Norman ("Norman"), the President of TLIC, made the decision to change the GMIB rate from six percent to five percent.  (Burkhardt Aff. Ex. P at 53-57.)  When asked when this decision was made, Norman testified that the final decision was made after the GMIB rider was pulled for new sales, but that he could not give an exact date and would defer to Ronald Ziegler.  (Burkhardt Aff. Ex. P at 53.)  Ronald Ziegler testified that the decision to change

5

the GMIB growth rate from six percent to five percent was made in the last week of January 2003. (Burkhardt Aff. Ex. V at 21.)  Mr. Ziegler also testified that the paperwork was completed for filing this product with the Securities and Exchange Commission around February 1, 2003.  (Burkhardt Aff. Ex. V at 14.)  On or about February 24, 2003, TLIC filed the paperwork for the public SEC filing and requested permission to issue a new GMIB rider, with the marketing name "MAP II," with a lower growth rate of 5%.  (Burkhardt Aff. Ex. I, ¶ 14.)  On April 29, 2003, TLIC received an effective date from the SEC for the MAP II rider of May 1, 2003.  (Burkhardt Aff. Ex. I, ¶ 15, attachment 7.)

Mr. Ziegler testified that the new MAP II rider "was available only for those who had a [pre-existing] rider who wished to upgrade."  (Burkhardt Aff. Ex. V at 52.)  Mr. Ziegler further testified that "the rider was put into place for the sole purpose of replacing the existing rider in the event of an upgrade . . . for those that . . . wished to elect an upgrade."  (Burkhardt Aff. Ex. V at 52.)

Van Ornum testified that he learned of the issuance of the new MAP II rider with a five percent growth rate on or about May 20, 2003.  (Burkhardt Aff. Ex. T at 213.)  Shore testified that he learned about the change in the growth rate on or about May 7, 2003.  (Burkhardt Aff. Ex. R at 185.)  Neither Plaintiff raised concerns about the legality of this change when they were notified in May 2003, nor did they raise concerns in June 2003.  (Burkhardt Aff. Ex. T at 224; Burkhardt Aff. Ex. R at 111-12; 200.)

At the end of June 2003, Nelson took over supervision of TCI.  (Burkhardt Aff. Ex. N at 7-8.)  In order to reduce costs Nelson took steps to combine TCI with Transamerica Financial Institutions.  (Burkhardt Aff. Ex. N at 15.)  As a part of this combination process, Nelson testified that her management team reviewed the employees of the company to determine who they thought

would fit well within the combined company and who would not.  (Burkhardt Aff. Ex. N at 16.)

Nelson testified that, during this process, both of Plaintiffs' names "repeatedly came up, not because

of their high producing ability, but because of their negative attitudes, somewhat condescending,

verbally rude toward peers and subordinates."  (Burkhardt Aff. Ex. N at 17.)  Nelson testified that

Phil Eckman, the President of TCI, conveyed information to her regarding Shore.  (Burkhardt Aff.

Ex. F at 7.)  Nelson testified that Phil Eckman told her that Shore had "a reputation for being

arrogant, self-serving, rude to peers, rude to subordinates . . . felt he was outside of the rules to some

degree because he was a top producer."  (Burkhardt Aff. Ex. N at 24-25.)  Nelson testified that Phil

Eckman gave her an example of this behavior, and stated that, at various wholesaler meetings, Shore

would

> berate other wholesalers for their lack of ability. [Shore] was embarrassed to be in
> the same room, in the same company with them.  He consistently was rude to staff
> and sales desk support people in Denver.  Felt entitled, felt people should drop other
> things to take care of his needs versus other wholesalers.

(Burkhardt Aff. Ex. N at 25.)  Nelson further testified that she did not "take much into account from

those discussions until [she] had some personal discussions with [Plaintiffs herself] which were

consistent with what [she had] heard."  (Burkhardt Aff. Ex. N at 17.)  When asked at her deposition

what facts she had to support her claim that Plaintiffs had negative attitudes, Nelson stated that she

had received "[i]nput from the management team [and] personal experience from talking to

[Plaintiffs']" as well as comments made in e-mails authored by Van Ornum that were subsequently

uncovered.  (Burkhardt Aff. Ex. N at 20.)

Meanwhile in July 2003 Shore was receiving calls from his field force concerning the GMIB

rider change in growth rate from six percent to five percent.  (Burkhardt Aff. Ex. R at 114.)  Shore

testified that, in July 2003, his "financial planners [were] calling in . . . looking for upgrades [and

the financial planners were] finding out about [the change from] six [percent] to five [percent.] There [were] a lot of angry people out there.  One of them was my biggest financial planner, Erin Botsford."  (Burkhardt Aff. Ex. R at 114.)  Shore testified that, when Ms. Botsford demanded an answer as to why the growth rate had changed, Shore contacted his supervisor, who suggested that he contact Norman.  (Burkhardt Aff. Ex. R at 114-15.)  Shore then contacted Norman and explained that his "biggest financial planner was extremely upset, and [he] needed somebody to explain why [the GMIB rider] went from six [percent] to five [percent]."  (Burkhardt Aff. Ex. R at 115.)  Shore testified that Norman told him that Norman would "be glad to help."  (Burkhardt Aff. Ex. R at 115.)

Shore testified that Norman called Ms. Botsford and that Shore called Ms. Botsford after her conversation with Norman.  (Burkhardt Aff. Ex. R at 115.)  Shore asked Ms. Botsford to tell him what transpired during her conversation with Norman.  Shore testified that Ms. Botsford told him that Norman stated that the decision to change the growth rate on the GMIB rider was made in the summer of 2002.  (Burkhardt Aff. Ex. R at 115.)  Shore testified that Ms. Botsford stated that, at a minimum, the actions of TLIC in changing the growth rate on the GMIB rider amounted to a "bait and switch" and at worst those actions amounted to fraud.  (Burkhardt Aff. Ex. R at 115.)  Shore testified that he contacted Norman and stated that, if the decision was made in the summer of 2002, he agreed with Ms. Botsford that TLIC's actions amounted to a bait and switch.  (Burkhardt Aff. Ex. R at 115.)  Shore testified that he did not recall whether Norman said anything to Shore "one way or another with regard to . . . the timing of [the] decision" to change the growth rate.  (Burkhardt Aff. Ex. R at 116.)  Norman testified that he did not tell Ms. Botsford that the decision to change the growth rate from six percent to five percent was made in 2002.  (Burkhardt Aff. Ex. P at 154.)  Ms. Botsford testified that it was her recollection that Norman told her that the decision to change the

8

growth rate was made in the fall of 2002.  (Burkhardt Aff. Ex. B at 43-44.)

Nelson testified that she had one conversation with Shore at the end of July or beginning of August 2003.  Nelson testified that she called Shore after she received a call from Norman after Ms. Botsford called Norman with her concerns regarding the growth rate change.  (Burkhardt Aff. Ex. N at 27.)  Nelson testified that Shore told her that he did not believe that TLIC should have lowered the growth rate.  (Burkhardt Aff. Ex. N at 27.)

Van Ornum testified that he met with Nelson on August 7, 2003, to discuss the changes that were made to the GMIB rider.  (Burkhardt Aff. Ex. T at 258-59.)  Van Ornum testified that he requested the meeting to discuss the change in the GMIB rider growth rate from six percent to five percent.  (Burkhardt Aff. Ex. T at 259.)  Van Ornum testified that he and Nelson were present at the meeting, along with Phil Eckman and Jay Hewitt.  (Burkhardt Aff. Ex. T at 259-60.)  Van Ornum testified that he informed Nelson at the meeting that "the decision . . . to change the . . . rider from 6 to 5 percent [was] causing a lot of very hard feelings among our clients . . . out in the marketplace."  (Burkhardt Aff. Ex. T at 260.)  Van Ornum testified that he informed Nelson that he was "hearing terms from . . . clients such as this is a bait and switch; this is fraud; I feel misled; this is dishonest; I'll never trust Transamerica again."  (Burkhardt Aff. Ex. T at 261.)  Van Ornum testified that he asked Nelson to reconsider and "rescind the decision to change the . . . rider from 6 to 5 percent."  (Burkhardt Aff. Ex. T at 261.)  Van Ornum testified that he told Nelson that he had a conversation with Shore the day before and Shore informed him that Norman stated that the decision to change the growth rate on the GMIB rider was made before new sales of that product were "pulled . . . from the marketplace."  (Burkhardt Aff. Ex. T at 262.)  Van Ornum testified that Nelson responded to this by stating "that's why we like to keep . . . Norman away from the clients.

As a matter of fact, the decision to change the . . . rider was made in July of [2002]."  (Burkhardt Aff. Ex. T at 262.)

Nelson testified that, during her meeting with Van Ornum, Van Ornum admitted that he sent an unapproved email to all his customers regarding the decrease in the growth rate and therefore he had "handled the issue."  (Burkhardt Aff. Ex. N at 54.)  Nelson testified that Van Ornum also talked about the new product that TCI was attempting to sell, and stated that "there was no way he could make a living selling th[e] [new] product."  (Burkhardt Aff. Ex. N at 56.)  Nelson stated that Van Ornum "was derogatory about the ability of a company to be successful selling multiple products." (Burkhardt Aff. Ex. N at 56.)

After this meeting Nelson asked Mike Brandsma ("Brandsma"), TCI's Chief Operating Officer, to retrieve Van Ornum's e-mails, using his administrator privileges.  (Burkhardt Aff. Ex. C at 24-29.)  Brandsma testified that he searched Van Ornum's e-mails for the unauthorized e-mail communication that Van Ornum admitted sending his customers regarding the change in the growth rate.  (Burkhardt Aff. Ex. C at 30.)  Brandsma testified that he "was not looking for dirt" on Van Ornum, but the e-mail to customers about the change in the growth rate was not the only e-mail he brought to Nelson's attention.  (Burkhardt Aff. Ex. C at 30.)  Brandsma testified that, while he was searching for the e-mail, he

> came across two other e-mails, one from his internal talking about how Mr. Martin was giving Mr. Van Ornum the answers to an integrity education requirement that everybody had to take on ethics.  And he passed- or [Van Ornum] actually asked him for the answers so he could input them in himself.  The other e-mail [Brandsma] found was with Mr. Shore and Mr. Van Ornum not saying the best things about [TCI].

(Burkhardt Aff. Ex. C at 30-31.)  Brandsma testified that he notified Nelson about these e-mails. (Burkhardt Aff. Ex. C at 31.)

10

At this time Mark Black (hereinafter "Black") was the Chief Financial Officer for TCI. (Affidavit of Adam Gillette (hereinafter "Second Gillette Aff.") Docket Number 367-368, Ex. 5 at 6-7.)  Black testified that after meeting with Van Ornum on August 7, 2003, "Paula [Nelson] left [Black] a voice mail and said 'I just met the biggest asshole I've ever met with in my life.'" (Second Gillette Aff., Ex. 5 at 11.)  Black testified that, due to this voice mail, he thought "there was probably a dislike or a lack of respect on Paula [Nelson's] part for [Van Ornum and Shore]." (Second Gillette Aff., Ex. 5 at 9-10.)

Nelson contacted Shore and Van Ornum by telephone individually on or about August 23, 2003, and informed them that their employment with TCI was being terminated because of "philosophical business differences."  (Burkhardt Aff. Ex. N at 73; Ex. T at 276-78; Ex. R at 201-02.)  Nelson telephoned Norman to inform him of Plaintiffs' termination.  (Burkhardt Aff. Ex. P at 23.)  Norman does not recall whether Nelson provided him with a reason for her decision to terminate Plaintiffs.   (Burkhardt Aff. Ex. P at 28-29.)

Nelson testified that she had never met Plaintiff Shore and she did not speak with his immediate supervisor prior to making the decision to terminate him.  (Burkhardt Aff. Ex. N at 21.) Nelson testified that she never spoke with Van Ornum's immediate supervisor prior to his termination and had only met Van Ornum once before she made the decision to terminate him. (Burkhardt Aff. Ex. N at 22-24.)  Nelson testified that her conversation with Shore was a factor in her decision to terminate Shore, as was her meeting with Van Ornum.  (Burkhardt Aff. Ex. N at 23-24; 28.)

Defendants now move for summary judgment on Count III Plaintiffs' amended complaint [#345], which alleges a claim for tortious interference with employment and prospective economic

relations against Defendants Norman and Nelson.   The parties agree that Minnesota Law is applicable to Van Ornum and that Texas law is applicable to Shore.  (See Def.'s Mem. at 4, Docket Number 357; Pl's Mem. in Opp. at 7, n. 7, Docket Number 365.)  For the reasons which follow, the Court recommends that Defendants' motion for summary judgment on Count III of Plaintiff's complaint [#345] be granted in part and denied in part.

## II.   STANDARD OF REVIEW

The Supreme Court has held that summary judgment is to be used as a tool to isolate and dispose of claims or defenses that are either factually unsupported or based on undisputed facts.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-27 (1986).  Therefore, summary judgment is appropriate when the moving party establishes that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322-23.  For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case; while a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, a court should construe all evidence in favor of the non-moving party.  Id. at 255.  Thus, summary judgment is appropriate when the court has viewed the facts and the inferences drawn from those facts, in a light most favorable to the non-moving party, and found no triable issue.  See Southwall Technologies, Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995).

## III.   LEGAL ANALYSIS

Both Texas law and Minnesota law permit Plaintiffs to proceed with a claim for tortious interference with an employment contract.  The elements of these claims are similar under both Minnesota and Texas law.  According to Texas law, "[t]he elements of tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage." Powell Industries, Inc. v. Allen, 985 S.W.2d 455, 456 (Tex.1998) (citing ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex.1997)).  According to Minnesota law, "the plaintiff in a tortious interference with contract action must prove: (1) the existence of a contract; (2) the alleged wrongdoer had knowledge of the contract; (3) an intentional procurement of a breach; (4) the alleged wrongdoer acted without justification; and (5) damages." Maness v. Star-Kist Foods, Inc., 7 F.3d 704, 709 (8th Cir.1993) (citing Furlev Sales and Assocs. v. North Am. Automotive Warehouse, Inc., 325 N.W.2d 20, 25 (Minn.1982)).

> **A.**    **There is No Genuine Issue of Material Fact Concerning Norman's Involvement in the Termination of Plaintiffs; Therefore, Defendants' Motion for Summary Judgment Should be Granted as to Norman.**

Pursuant to Texas law, "[a] defendant may defeat a tortious interference claim on summary judgment by disproving one element of the claim as a matter of law." Powell Industries, Inc., 985 S.W.2d at 457 (citing Wornick Co. v. Casas, 856 S.W.2d 732, &33 (Tex.1993)).  Similarly, in Maness, the Eighth Circuit noted that the district court did not err in granting summary judgment where the plaintiff had not offered any evidence that the third party "intended to cause [the plaintiff's] termination or that he did cause it." Maness, 7 F.3d at 709.

13

In the present case neither Plaintiff has come forward with any evidence to support their claim that Norman intended to cause, or did actually cause, Plaintiffs' termination. Plaintiffs argue that the record suggests that Norman did intentionally interfere. Plaintiffs point to the fact that Norman was Nelson's boss and that he "was aware of the potentially fraudulent nature of the rate change" as he had "two conversations with Shore in which Shore suggested the rate change was fraudulent." (Pl.'s Mem. in Opp. at 8, Docket Number 365.) Plaintiffs also allege that Nelson "testified that Norman's call was a factor in her decision to terminate Shore" however, the record does not support this claim.[9] After Van Ornum spoke to Shore about Shore's conversations with Norman, Van Ornum reported TCI's allegedly improper activities to Nelson on behalf of himself and Shore. Shortly after doing so, Nelson terminated Plaintiffs and "then called Norman to inform him of her decision." (Pl.'s Mem. in Opp. at 9.) Plaintiffs' note that, although Plaintiffs were top sellers of Norman's products, Norman did not object to their termination or demand a justification from Nelson. Plaintiffs' argue that this record "supports a reasonable inference that Norman used his leverage with TCI, and Nelson in particular, to get Nelson to put an end to the inquiries of Shore and Van Ornum." (Pl.'s Mem. in Opp. at 9.)

The Court has reviewed Plaintiffs' arguments, as well as the record in this case, and determined that there is no genuine issue of material fact as to whether Norman acted with the intent to interfere with either of Plaintiffs' at-will employment relationships with TCI. Both Norman and Nelson testified that Norman was not involved in the decision to terminate Plaintiffs. (Affidavit of Emily Burkhardt (hereinafter referred to as "Second Burkhardt Aff.") Ex. E ¶ 16; Ex. G at 22.)

---

[9] Plaintiffs' counsel conceded at oral argument that this claim was mistaken and that Nelson never testified that her conversation with Norman was a factor in her decision to terminate Shore.

Plaintiffs' have not produced any evidence to support their claim that Norman intentionally interfered with their at-will employment contracts.   Plaintiffs' admit in their memorandum in opposition that Nelson called Norman *after* she made the decision to terminate Plaintiffs.   Plaintiffs merely speculate that, based on the foregoing evidence,

> a trier of fact could reasonably conclude (1) that Norman knew some of TCI's salespeople, such as Plaintiffs, would not tolerate a business philosophy based on misrepresentation and fraud, (2) that he called Nelson and told her to get rid of the dissenters, and (3) that when Nelson called him to confirm that she had just terminated two top sellers of his products, he did not need an explanation because he was the one who requested their termination in the first place.

(Def.'s Mem. in Opp. at 9.)   There is no evidence, either direct or circumstantial, to support any of these claims, and therefore there is no genuine issue of material fact concerning whether Norman acted with the intent to interfere with Plaintiffs' employment contracts with TCI.   Since there is no genuine issue of material fact concerning an element of the claim for tortious interference under both Minnesota and Texas law, the Court recommends that Defendants' motion for summary judgment be granted insofar as it relates to Defendant Norman.

     **B.**    **Shore's Claim of Toritous Interference Fails as Against Nelson Because There is No Genuine Issue of Material Fact That Nelson Acted Solely in Her Own Interests When She Terminated Shore.**

As noted above, under Texas law, there are four elements to a claim for tortious interference with a contract.   The Texas Supreme Court noted that "[w]hen the defendant is both a corporate agent and the third party who allegedly induces the corporation's breach, the second element [willful and intentional interference] is particularly important." Powell Industries, Inc., 985 S.W.2d at 456-57 (citing Holloway v. Skinner, 898 S.W.2d 793, 796 (Tex.1995)).   The Texas Supreme Court stated that "[b]ecause a corporate officer's acts on the corporation's behalf usually are deemed corporate acts, a plaintiff must show that the agent acted solely in his own interest." Id. at 457.   Therefore,

the Texas Supreme Court concluded that a plaintiff alleging such a claim against a corporate officer "must prove that the agent acted willfully and intentionally to serve the agent's personal interests at the corporation's expense." Id. "A corporate officer's mixed motives-to benefit both himself and the corporation-are insufficient to establish liability." Id.

In the present case Shore has not come forward with any evidence that creates a genuine issue of material fact as to whether Nelson acted solely in her own interest and against the interests of TCI when she terminated Shore's employment. Shore argues that Nelson's conduct calls into question whether she has a good faith belief that terminating Shore was in TCI's best interest, because Shore was one of TCI's "top performers" and, therefore, Shore argues that "[a] reasonable jury could find that terminating the number one sales person was not in the best interest of TCI." (Pl.'s Mem. in Opp. at 16.) Shore argues that Nelson cannot point to any conduct Shore engaged in that may have violated TCI's policies or any applicable law. Shore argues that, prior to his termination, Nelson never looked at his personnel file or spoke to his supervisor, and that "[d]espite the lack of personal interaction or investigation, Nelson managed to develop personal animus toward Shore." (Pl.'s Mem. in Opp. at 16.) To support this claim, Shore states that "Nelson told Martin that she fired Shore (and Van Ornum) because 'she didn't want them to have a negative attitude in the back of her meetings with their arms crossed.'" (Pl.'s Mem. in Opp. at 16.) (quoting Second Gillette Aff., Ex. 12 at 45-46.) Shore argues that

> [w]hat makes this comment even more telling is that Nelson had no meetings with Shore on which to base her belief that Shore would have a bad attitude . . . It is difficult to see what interest of TCI was served by firing one of its top revenue producers without even checking his personnel file or speaking to those with whom he worked on a daily basis to verify the rumors regarding his attitude and demeanor. On the other hand, a reasonable jury could conclude that Shore's termination clearly satiated Nelson's personal desire to get rid of Shore.

(Pl.'s Mem. in Opp. at 16.)[10]

Shore has not come forward with any evidence to support his claim that Nelson acted solely in her own interest and against TCI's interest when she terminated Shore's employment, as he must to survive summary judgment on his claim against Nelson for tortious interference. There is no evidence in the record that Nelson acted solely in her own personal interests, and against the interests of TCI, in terminating Shore. The fact that Shore was a top producer for TCI does not mean that his termination is necessarily an action that is against TCI's interests. It is undisputed that Nelson received information from several people in TCI that Shore had a negative attitude toward his co-workers and subordinates. Shore's negative attitude toward his co-workers and subordinates constitutes a legitimate business factor that would motivate a company to terminate its top producer, in its own best interests. Shore has not come forward with any evidence, either direct or circumstantial, to create a genuine issue of material fact as to whether Nelson acted solely in her own interest, and against the interests of TCI, when she terminated him. Therefore, the Court recommends that Defendants' motion be granted as to Plaintiff Shore.

### C.    There is a Genuine Issue of Material Fact As to Whether Nelson Acted with

------

[10] Shore also argues that "Texas courts, like those in Minnesota, have held that where an agent of an employer takes action against an employee that creates a claim for wrongful discharge, the agent will be subject to personal liability for tortious interference if the agent's action was motivated by malice." (Pl.'s Mem. in Opp. at 17.) Shore initially alleged two wrongful discharge claims: a claim for violation of the Minnesota Whistleblower Act, Minn. Stat. § 181.932, and a claim for wrongful discharge under Texas law. However, Defendants moved for partial judgment on the pleadings on Shore's Minnesota Whistleblower Act claim and Shore did not oppose that motion. (Docket Number 76.) Similarly, Defendants moved for summary judgment on Shore's wrongful discharge claim under Texas law and Shore did not oppose that motion. (Docket Number 342.) Hence, Shore himself does not believe that the actions Nelson took create a claim for wrongful discharge, and, therefore, the Court need not address this argument further, as Shore himself concedes that Nelson did not take any action against him that created a claim for wrongful discharge.

17

**Actual Malice When She Terminated Van Ornum.**

The general rule in contract law is that a party cannot interfere with its own contract. Bouten v. Richard Miller Homes, Inc., 321 N.W.2d 895, 901 (Minn.1982). In Nordling v. Northern States Power Co., the Minnesota Supreme Court elaborated on this rule as it pertains to the actions of agents and officers of a corporation by stating

> If a corporation's officer or agent acting pursuant to his company duties terminates or causes to be terminated an employee, the actions are those of the corporation; the employee's dispute is with the company employer for breach of contract, not the agent individually for a tort . . . Nevertheless, we recognized in *Bouten* that a corporate officer or agent may be liable for tortious contract interference if he or she acts outside the scope of his or her duties.

478 N.W.2d 498, 505-06 (Minn.1991) (citing Bouten, 321 N.W.2d at 900-01).

The Nordling Court noted that

> [i]t is not always easy to determine when a corporate officer or agent's actions are outside the scope of his company responsibilities, *i.e.*, when he is engaged in a personal vendetta or excursion. Particularly is this true in a job termination case where the officer's duties include the evaluation and supervision of the plaintiff employee's performance or the power to participate in the corporate decision to terminate or otherwise discipline the plaintiff.

Id. at 506. To properly determine whether a corporate agent or officer acted outside the scope of his or her duties, in a situation where the "contract interfered with is an employment contract and the alleged interferer is employed by the same employer" the Nordling Court held that "the defendant's motive becomes critical." Id. The Nordling Court further noted that "[w]hile motive or malice is only one factor to consider in determining whether a defendant officer or agent is acting outside the scope of his duties in dealing with the plaintiff employee, it can be the critical factor." Id.

The Nordling court stated that "where we must balance a discharged employee's need for

a remedy against the concern not to chill company personnel in the performance of their duties, we conclude, when motive or malice becomes relevant on the issue of improper interference, that this malice be actual malice." Id. Plaintiff has the burden of proving actual malice. Id. at 507. The Nordling Court concluded that

> a company officer, agent or employee is privileged to interfere with or cause a breach of another employee's employment contract with the company, if that person acts in good faith, whether competently or not, believing that his actions are in furtherance of the company's business. This privilege may be lost, however, if the defendant's actions are predominately motivated by malice and bad faith, that is, by personal ill-will, spite, hostility, or a deliberate intent to harm the plaintiff employee.

478 N.W.2d at 507.

In Piekarski v. Home Owners Savings Bank, F.S.B., 956 F.2d 1484 (8th Cir.1992), the plaintiff alleged a claim against one defendant, the president of the Bank, for tortious interference with the contractual relationship between the plaintiff and with his employer, the Bank. The record in the case demonstrated that the relationship between the plaintiff and the president was strained due to a personality conflict between the two. The record also indicated that the president of the Bank considered the plaintiff to be a negative influence at the Bank and the president thought that the plaintiff's termination would benefit the Bank. Id. at 1495. The Eighth Circuit held that "[a]lthough the personality conflict between [the plaintiff] and [the Bank President] also could have prompted the termination, we find that this motive does not rise to the level of actual malice *unless* the reason for the personality conflict would give the employee a claim against the employer for wrongful discharge." Id. at 1495-96 (*emphasis added*).

In Petroskey v. Lommen, Nelson, Cole and Stageberg, the District of Minnesota considered a claim by an employee against one of the principal shareholders of his employer for tortious interference with an employment contract. 847 F.Supp. 1437, 1450 (D.Minn.1994). The Petroskey

Court noted that

> [u]nder the governing law . . . an actionable claim will not lie for a discharge in the
> workplace, that is precipitated by conduct that is impolitic, boorish or intemperate,
> so long as that conduct is not wrongful-that is, so long as the conduct does not breach
> a contractual agreement, implied or express; a clearly manifested public policy; or
> a constitutionally or statutorily protected right.

847 F.Supp. at 1450.

Van Ornum argues that the record in this case supports a finding that Nelson acted with actual malice toward Van Ornum because he informed Nelson that he believed that the change in the GMIB rider rate was fraudulent. Van Ornum argues that he only met with Nelson once, in August 2003, to discuss the rate change, and that at that time Nelson confirmed that the decision to change the rate was made in July 2002. After that meeting, Nelson called Black and referred to Van Ornum as an "asshole." In addition, Nelson directed Brandsma to "snoop through Van Ornum's emails." (Pl.'s Mem. in Opp. at 12.) Nelson testified that her meeting with Van Ornum on August 7, 2003, was a factor in her decision to terminate his employment with TCI. Van Ornum argues that he "clearly had established himself as one of TCI's top performers, but Nelson argues that she terminated him because of his poor attitude." (Pl.'s Mem. in Opp. at 13.) Van Ornum argues that Nelson did not "exhibit a desire to terminate him until after he questioned the legality of the [GMIB rider] rate decrease." (Pl.'s Mem. in Opp. at 13.) Van Ornum notes that, although Nelson points to the e-mails she uncovered to show that his termination "was legitimate because he made inappropriate comments about TCI's management and acted unethically" Nelson testified that she terminated Van Ornum due to "philosophical differences," not because of alleged ethical violations or insubordination. (Pl.'s Mem. in Opp. at 13.) Nelson never reviewed Van Ornum's personnel file before terminating him, nor did she speak to his supervisor, and Van Ornum argues that "[t]he fact

20

that Nelson failed to perform a fair and comprehensive investigation supports the inference that her decision to terminate Van Ornum was motivated by personal ill-will." (Pl.'s Mem. in Opp. at 13.)

In the present case, the Court has already determined that there are questions of fact as to whether Van Ornum's termination was a violation of the Minnesota Whistleblower Act, and, therefore, Van Ornum argues that there is a similar fact question as to "whether the conflict between Van Ornum and Nelson was Van Ornum's whistleblowing, which is protected conduct under Minnesota law." (Pl.'s Mem. in Opp. at 13, n. 9.) Van Ornum argues that, although Nelson had the authority to terminate him, "[w]hen she exercised that authority in violation of whistleblower laws, she subjected TCI to liability for wrongful discharge" and further argues that "[b]ecause her violation of whistleblower laws was motivated by personal ill-will and a deliberate intent to harm Van Ornum, she subjected herself to liability for tortious interference." (Pl.'s Mem. in Opp. at 15.)

The Court concludes that there is a genuine issue of material fact as to whether Nelson acted with actual malice when she terminated Van Ornum. As noted by the Eighth Circuit in Piekarski, a personality conflict "does not rise to the level of actual malice *unless* the reason for the personality conflict would give the employee a claim against the employer for wrongful discharge." 956 F.2d at 1495-96 (*emphasis added*). The Court concludes that there is a genuine issue of material fact as to whether the reason for the "philosophical differences" between Nelson and Van Ornum that resulted in his termination in the present case were due to Van Ornum's report to Nelson concerning the GMIB rider, the report which forms the basis for Van Ornum's whistleblower claim. This Court, in its previous Report and Recommendation, which was adopted by the district court, determined that there is a genuine issue of material fact as to whether Van Ornum engaged in protected activity

when he reported his concerns about the GMIB rider to Nelson.[11]  This Court also determined that there was a genuine issue of material fact as to whether that protected activity caused Nelson to terminate Van Ornum.  As the Court has already determined that there is a genuine issue of material fact as to whether the protected activity that Van Ornum engaged in caused Nelson to terminate him, the Court also concludes that there is a genuine issue of material fact as to whether the "philosophical differences" between Van Ornum and Nelson were due to the actions that he took that gave rise to his whistleblower claim and, hence, whether Nelson's actions in terminating Van Ornum were motivated by actual malice.

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion for leave to file renewed motion for summary judgment on Count III of Plaintiffs' amended complaint [#343] be **GRANTED** and Defendants' motion for summary judgment on Count III of Plaintiffs' amended complaint [#345] be **GRANTED** as to Defendant Norman, **GRANTED** as to Shore's claim against Nelson, and **DENIED** as to Van Ornum's claim against Nelson.

DATED: October 12, 2006                                    s/ *Franklin L. Noel*
                                                          FRANKLIN L. NOEL
                                                          United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **October 31, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's

---

[11] See Docket Number 342 at 18-22; see also Docket Number 376.

brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **October 31, 2006** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.